Exhibit A:

## DECLARATION OF JAMES MASKELL IN SUPPORT OF VERIFIED COMPLAINT FOR FORFEITURE *IN REM*

I, James Maskell, Special Agent with the Federal Bureau of Investigation ("FBI"), do hereby declare:

## INTRODUCTION AND AGENT BACKGROUND

1.  I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been so employed since December 5, 2021. I am currently assigned to the Baltimore Division of the FBI, Complex Financial Crimes Squad. In this capacity, I am charged with investigating possible violations of federal criminal law, specifically those involved with white-collar crimes. Through the course of my employment, I have participated in numerous criminal investigations involving financial crimes and recently spent approximately four months receiving training on criminal investigations at the FBI Academy in Quantico, Virginia. I have participated in the execution of numerous federal search and seizure warrants. I perform and have performed a variety of investigative tasks, including the identification and collection of computer related evidence.

## PURPOSE OF THIS DECLARATION

2.  This Declaration is submitted in support of the Verified Complaint for Forfeiture *In Rem* of the USDT tokens associated with the virtual currency address "TNEmxWmmFfpFbNg5t6T4NAuTZJ8J2y8gtm", herein referred to as the "Defendant Property."

3.  I submit that there are sufficient facts to support a reasonable belief that the Defendant Property constitutes proceeds traceable to a violation of 18 U.S.C. § 1343 (wire fraud) and is involved in violations of 18 U.S.C. § 1956(a)(1)(B)(i) (money laundering) and thus is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) and (C).

## INVESTIGATION OF THE DEFENDANT PROPERTY

## Background on Relevant Cryptocurrency Entities and Concepts

### Cryptocurrencies and Transaction Analysis

4.      Cryptocurrencies, also known as virtual currency, are not tied to any nation's fiat currency. The owner of cryptocurrency is assigned a mathematical encryption key pair, consisting of a "public key" and a "private key," with which to control the currency they own. The public key is also known as an "address," is visible to the public, and allows members of the public to verify the owner of virtual currency and other information. Addresses are also used to send and receive cryptocurrency. Wallets are software programs that interface with blockchains and generate and/or store the public addresses and private keys used to send and receive cryptocurrency. A "wallet" can hold multiple addresses for a user, and an "account" can hold multiple wallets for a user. Users can transfer cryptocurrency into a wallet, and the cryptocurrency may be housed in any of the addresses within the wallet. The private key, also known as a "secret key," is essentially a password used to execute cryptocurrency transactions. Secret keys are typically only shared with the owner of the address.

5.      Cryptocurrency transactions can have multiple inputs and multiple outputs. While the ownership of any particular address or wallet can be anonymous, all transactions of cryptocurrencies are recorded on a "blockchain," which is a series of "blocks" of transactions that establishes a verifiable, transparent record of the movement of virtual currency. Blockchains in this context are viewable by the public; they show all transactions, but do not reflect who owns a particular address. As cryptocurrency transactions are processed, they are assigned a unique identifier on the blockchain called a transaction hash.

6.      Cryptocurrency exchanges exist and operate similarly to fiat currency exchanges.

Customers use these exchanges to trade one form of digital currency for another, or to exchange digital currency into fiat money. In my training, knowledge, and experience, fraudsters will use cryptocurrency exchanges to launder or obfuscate their illicit gains.

7. Based on my training, knowledge obtained from FBI cryptocurrency experts, and experience with cryptocurrency, financial account information, including cryptocurrency wallets, is not typically shared across multiple, unrelated individuals. I also know that when information is shared, it is usually among a trusted group working in concert. In addition, the work of one individual using multiple identifiers can give the false appearance that information has been shared.

8. Based on my training, knowledge obtained from FBI cryptocurrency experts, and experience with cryptocurrency, I know that cryptocurrency can be laundered through multiple wallets and accounts in a manner that is similar to the laundering of fiat currency through different banks and bank accounts. However, with cryptocurrency the laundering transactions have the potential to be done in a faster and more efficient manner than through banking institutions. Fraudsters may attempt to obtain money from victims in the form of cryptocurrency because of its efficiency to be transferred from the United States and laundered through cryptocurrency accounts maintained outside of the United States.

9. Based on my training, knowledge obtained from FBI cryptocurrency experts, and experience, I know that individuals engaged in criminal activity involving cryptocurrency frequently engage in "chain hopping," meaning that they convert funds from one cryptocurrency to another, in order to attempt to obscure the source of funds and make it more difficult to track illicit funds as they move from one blockchain to another.

Tether

10.     **Stablecoins**: Stablecoins are a type of virtual currency whose value is pegged to a commodity's price, such as gold, or to a fiat currency, such as the U.S. dollar, or to a different virtual currency. For example, USDC is a stablecoin pegged to the U.S. dollar. Stablecoins achieve their price stability via collateralization (backing) or through algorithmic mechanisms of buying and selling the reference asset or its derivatives.

11.     **Tether (USDT):** Tether Limited ("Tether") is a company that manages the "smart contracts" and the "treasury" (*i.e.*, the funds held in reserve) for USDT tokens (a stablecoin). In this case, the Defendant Property was seized via a seizure warrant signed by the Honorable Ajmel A. Quereshi, United States Magistrate Judge in the District of Maryland on December 9, 2025.

## The Investigation

### Victim 1

12.     The FBI is investigating a cryptocurrency investment fraud scam.  The investigation began in August 2025, when the FBI received a complaint from the St. Mary's County Sheriff's Office ("SMCSO") regarding allegations of investment fraud reported by Victim 1, a resident of St. Mary's County, Maryland.

13.     Victim 1 initially filed an online complaint with the SMCSO on or about July 3, 2025. The complaint stated that Victim 1 invested in a shipping container lease business and that funds were 'stolen' from his cryptocurrency wallet as a result of the investment. The complaint further stated that Victim 1 possessed signed leases with purchase orders for the containers that demonstrated his ownership.

14.     Victim 1 was subsequently interviewed on multiple occasions by SMCSO and by FBI Baltimore.

15.     Throughout the course of the interviews, Victim 1 stated that he located an

advertisement for a shipping company named # 1 Innovative Auction ("NOIA") online on or about May 3, 2025. Victim 1 clicked on a link to learn more about the company, which led him to the web page "flrst.auction."

16.     According to Victim 1, the website advertised that the company was involved in shipping motor vehicles and offered investors the opportunity to purchase different types of containers, which NOIA would then lease.  Investors would receive a portion of the lease fees from each container owned.

17.     When Victim 1 initially contacted NOIA, the individual he communicated with stated that her name was "Isabella". Victim 1 communicated with "Isabella" through WhatsApp.

18.     Victim 1 continued to communicate with "Isabella" over the course of several weeks between May and July 2025, and asked her how the investment process would work.

19.     "Isabella" told Victim 1 that "our investment company is located in Bulgaria" and "we will send you a contract for signature and it will contain everything".

20.     "Isabella" sent Victim 1 an "Investment Cooperation Agreement" ("ICA") which listed the location of the company as Sofia, Bulgaria and listed the name "Auto Hub Europe LTO" as the "Management Company" of the containers purchased as a part of the investment.

21.     The ICA stated that investors were to purchase the containers from the "Management Company" and the "Management Company" would lease the containers to clients and provide the investor with monthly payments.

22.     Victim 1 initially purchased one shipping container for approximately $4,645.60. Victim 1 sent the payment for the initial purchase through a traditional bank wire transfer to a First Investment Bank account in Bulgaria associated with Auto Hub Europe LTD.

23.     Following the initial purchase, Victim 1 received a payment of approximately

$171 for the lease of his container and ultimately decided to invest more in the company.

24.    All subsequent purchases of containers made by Victim 1 as a part of the investment were made through cryptocurrency transactions.

25.    According to Victim 1, Victim 1 purchased a total of six containers for approximately $690,216.35 in cryptocurrency in or about June 2025. Victim 1 provided FBI Baltimore with written rental agreements, as well as invoices for the purchase of the shipping containers.

26.    "Isabella" directed Victim 1 through every step of the investment with NOIA and provided Victim 1 with a wallet address or address(es) to send cryptocurrency payments to for the purchase of the additional containers.

27.    Victim 1 received another larger payment from NOIA for approximately $6,500.00 - $6,800.00 (which included a second $171.00 payment).

28.    Victim 1 believed he received less than $7,000 in total from "Auto Hub Europe LTD", all made to his cryptocurrency wallet.

29.    Victim 1 believed the returns he received were likely derived from the original funds he sent NOIA.

30.    On or about July 1, 2025, Victim 1 was due to receive another payment from the lease of his containers.

31.    On that same day, Victim 1 was advised by "Isabella" that NOIA's cryptocurrency account had been frozen and as a result, NOIA could not make the scheduled payment to Victim 1.

32.    "Isabella" informed Victim 1 that NOIA's cryptocurrency account had been frozen as the result of an anti-money laundering (AML) verification procedure.

Isabella provided Victim 1 with a screenshot containing a notification purported to be from Binance indicating that NOIA's account had been frozen. Binance subsequently confirmed, when questioned by FBI Baltimore, that the "notification" was not from Binance.

33. "Isabella" advised Victim 1 to deposit funds in his mobile crypto wallet and click on an attached hyperlink so that the AML procedure could be run and verify that no money laundering was taking place.

34. As a result, Victim 1 transferred approximately $590,000 to his mobile crypto wallet and clicked on the hyperlink "Isabella" had instructed him to click.

35. According to Victim 1, the $590,000 disappeared from Victim 1's mobile crypto wallet within two minutes of clicking on the hyperlink.

36. In retrospect, Victim 1 believes that when he clicked on the link, he allowed "Isabella" and/or the other individuals involved in the scam access to his cellular phone and in return, they were able to access his mobile crypto wallet funds.

37. When the funds disappeared from Victim 1's mobile crypto wallet, "Isabella" advised Victim 1 that everything was fine and that the money would be returned shortly.

38. However, the funds were never returned.

39. Victim 1 repeatedly reached out to "Isabella" and requested the return of the funds.

40. "Isabella" provided Victim 1 with an alleged screenshot of an email sent from NOIA to support@binance.com in which "Isabella" supposedly urged Binance to complete the AML verification procedure.

41. "Isabella" told Victim 1 that she would provide $50,000 of her own funds if Victim 1 would deposit the additional funds needed to rectify the issue, but Victim 1 refused.

42. Victim 1 eventually asked to speak with "Isabella's" manager, and "Isabella"

connected Victim 1 with "Thomas Becker", who was allegedly "Isabella's" boss and the owner of NOIA.

43.     "Thomas Becker" aggressively tried to convince Victim 1 to deposit additional funds, but Victim 1 refused.

44.     In total, Victim 1 reported a loss of $1,280,216.35 in cryptocurrency.

45.     Coinbase statements provided by Victim 1 indicate $1.2 million of Victim 1's funds were used to primarily purchase Ripple (XRP) and USDC.

46.     Victim 1's funds were exchanged for USDT at decentralized instant exchanges such as Aeroswap, Switchain, N. Exchange, and ChangeHero before being sent, in part, to the Defendant Property.

47.     Tracing of two of the withdrawals from Victim 1's Coinbase account are shown below in Tables 1 and 2:

### TABLE 1 – Tracing of Victim 1's funds to DEFENDANT PROPERTY

| DATE | AMOUNT | SOURCE | DESTINATION |
|---|---|---|---|
| 07/01/2025 | 599,999 USDC | Victim 1 Coinbase Account | 0x75B69c5E69b20AE4415f51D3A102e323c72ed1e4 ("Address 1") |
| 07/01/2025 | 590,000[1] USDC | Address 1 | 0x3E8E5590c3f336dBa7D568bFAeef08d2E5B0CBF2 ("Address 2") |
| 07/01/2025 | 590,000 USDC | Address 2 | 0x52b6304c41E122eB42F9ea7cABF64925f726fbB6 ("Address 3") |
| 07/01/2025 | 590,025 USDC | Address 3 | 0x9fEB3E0E9fD3786253D49380464595098841AfF9 ("Address 4") |
| 07/01/2025 | 513,635 USDC | Address 4 | N. Exchange |

---

[1] When crypto currency funds are laundered from address to address in fraud schemes, amounts transferred from address to address are not always the exact amount received from a fraud victim. Amounts from different victims are co-mingled and moved from address to address at various times and in various amounts. In your Affiant's training and experience, this is done intentionally to confuse and frustrate law enforcement efforts. The tracing shown throughout this affidavit is consistent with this.

| 7/01/2025 | 502,461 USDT | N. Exchange | TEM1WQVj62chPkAUsSBX9e5kKKpqXsMDRX ("Address 5") |
|---|---|---|---|
| 07/01/2025 | 76,362 USDC | Address 4 | ChangeHero |
| 07/01/2025 | 74,594 USDT | ChangeHero | TEM1WQVj62chPkAUsSBX9e5kKKpqXsMDRX ("Address 5") |
| 07/01/2025 | 550,056 USDT | Address 5 | TRHQoBt8v1SbtWnwqLRRkidH3DJKj3J3VS ("Address 6") |
| 07/01/2025 | 547,000 USDT | Address 6 | TRvG5FDLcUuyRmmLvGPkCDMgPxLymQJkkf ("Address 7") |
| 07/07/2025 | 225,000 USDT | Address 7 | DEFENDANT PROPERTY |

### TABLE 2 – Tracing of Victim 1's funds to TARGET PROPERTY

| DATE | AMOUNT | SOURCE | DESTINATION |
|---|---|---|---|
| 06/21/2025 | 138,980 XRP | Victim 1 Coinbase Account | rLtTr1FAsx3NmU4q6zhLjF7Quh2UFHZnXe ("Address 8") |
| 06/21/2025 | 115,570 XRP | Address 8 | N. Exchange |
| 6/21/2025 | 234,515 USDT | N.Exchange | TEM1WQVj62chPkAUsSBX9e5kKKpqXsMDRX ("Address 5") |
| 06/21/2025 | 23,188 XRP | Address 8 | Switchain |
| 06/21/2025 | 47,001 USDT | Switchain | TEM1WQVj62chPkAUsSBX9e5kKKpqXsMDRX ("Address 5") |
| 06/21/2025 | 281,516 USDT | Address 5 | TRHQoBt8v1SbtWnwqLRRkidH3DJKj3J3VS ("Address 6") |
| 06/21/2025 | 200,000 USDT | Address 6 | DEFENDANT PROPERTY |

### Victim 2

48.     In early June 2025, Victim 1 informed Victim 2 about the shipping container investment program with NOIA.

49.     Victim 2 decided to invest approximately two weeks after Victim 1 invested funds.

Similar to Victim 1, Victim 2 initially communicated with an individual purported to be named "Isabella," and subsequently communicated with an individual purported to be named "Tomas Becker"[2] from NOIA. All communication with "Isabella" and "Tomas Becker" was through WhatsApp on the same numbers provided by Victim 1.

50.     Victim 2 completed one transaction as a part of the investment and was provided with an ICA that contained virtually identical language to the ICA provided to Victim 1.

51.     Victim 2 sent a payment of approximately $28,970.75 USD in cryptocurrency on June 27, 2025, to purchase a container.

52.     Victim 2 received a lease payment of approximately $2,175.29 on July 7, 2025.

53.     Around the time that Victim 2 received the $2,175.29 payment, Victim 2 learned that Victim 1 was having trouble obtaining payments from NOIA as scheduled.

54.     NOIA personnel were aware that Victim 1 and Victim 2 were associates because Victim 1 referred Victim 2 to the investment and was supposed to receive a referral fee from the company.

55.     Victim 2 asked when Victim 1's situation would be resolved. "Isabella" and/or "Becker" told Victim 2 that Victim 1 had the company's money "locked up" and it could not be resolved until Victim 1 paid additional funds.

56.     "Isabella" and/or "Becker" also told Victim 2 that the company would not be able to send Victim 2 any additional payments for his investment until Victim 1 paid the funds he owed and resolved the issue.

57.     Eventually, Victim 2 asked for his funds to be returned, and they never were – Victim 2 only ever received the $2,175.29 payment.

---

[2] "Tomas Becker" and "Thomas Becker" are believed to be the same individual.

58.    Victim 2 conducted a reverse search of images utilized by NOIA and found the images to be associated with another company named TANK GLOBAL SOLUTIONS (TGS).

59.    Victim 2 reached out to TGS and verified that the images used by NOIA belonged to the TGS, but that the images had been altered.

60.    Victim 2 sent approximately 28,970 USDC to an address controlled by the fraudsters.

### Seizure of Assets

61.    On September 23, 2025, Tether agreed to freeze the Defendant Property at the request of your FBI Baltimore after being provided the wallet associated with the fraud scheme.

62.    As of September 23, 2025, the Defendant Property had a balance of 1,622,635 USDT.

63.    On December 11, 2025, the federal government seized the Defendant Property, based on a seizure warrant signed by the Honorable Ajmel A. Quereshi, United States Magistrate Judge in the District of Maryland.

### Conclusion

64.    Based on the forgoing, I submit that there is probable cause to believe the funds held in the Defendant Property, in any form, are proceeds of, or traceable to proceeds of, violations of 18 U.S.C. §1343 (Wire Fraud), and are involved in violations of 18 U.S.C. § 1956(a)(1)(B)(i) (Money Laundering), and therefore subject to civil forfeiture, pursuant to 18 U.S.C. § 981(a)(1)(A) and (C).

_____
Special Agent James Maskell
Federal Bureau of Investigation